## M'Cullough *versus* Irvine's Executors.

A tenant for life cannot, during his occupancy, lawfully remove from the premises buildings of a permanent character, such as a two story brick dwelling house and barn, which were erected by him, on the same; and, in an action by the remainder man, for such removal, the question is, whether or not, the *inheritance* has been injured by such removal, and the rule, as to damages, is the amount of the injury.

As to whether the cutting of timber upon the premises, by the tenant for life, be *waste*, will depend on the custom of farmers, the situation of the country, and the value of the timber; and in regard to damages, the rule is the same as above stated.

.ERROR to the Common Pleas of *Cumberland county*.

This was a suit by M'Cullough, plaintiff in error, against Irvine's executors.  It was an action on the case, in the nature of waste in which the injury complained of was  cutting down and destroying the timber growing upon a tract of land of 139 acres, and pulling down and removing a two story brick house and bank barn, the under part of which was stone, and the upper part frame, which buildings had been erected by defendant's testator, and removed by him in his life time.

The land in question was the property of John Dunbar, who died prior to 1830, and on the 30th November, 1830, this land was taken upon proceedings in partition in the Orphans' Court, by Samuel Irvine, husband of Rosanna, eldest daughter of said Dunbar, in right of his wife, at $3,945.  He paid out one-third to the other heirs, the two-thirds he retained in right of his wife, being her share of her father's estate.

In 1832, he erected on said land a two story brick house, worth $600; also a bank barn, wagon shed, and corn cribs, worth $1000, according to the evidence.

Samuel Irvine had issue by his wife, two children, one died in infancy; Mary, his other child, died 7th January, 1833, aged 3 years, and his wife died 4th April, 1834.

Samuel Irvine, upon the death of his wife, was tenant in fee of one undivided third, and tenant by the courtesy of the remaining undivided two-thirds.  The remainder in fee in three-fourths of the remaining two-thirds (or half of the whole) became vested in John M'Cullough, the plaintiff, who was married to Jane Dunbar, after the death of Mrs. Irvine, and previous to the removal of the buildings.  The house and barn were thrown down and removed from the land by Samuel Irvine, in May, 1847.  He removed them to land of his own.

When the land was confirmed to Irvine, in 1830, there were no buildings on it, about 40 acres cleared but in a bad state of cultivation; about 10 acres of the timber land were not of a good

quality, the balance was young thriving timber, but not large, in 1830. In 1845, Irvine had all the land cleared but about 25 acres, and at his death there was about 10 acres of timber land on the whole tract. The timber on the 15 acres cleared from 1845 to the death of Samuel Irvine, was worth $36 per acre clear of all expense of cutting. This sum plaintiff claimed to recover in addition to the value of the buildings removed.

The witnesses on the part of defendants testified that the whole land was worth, in their opinion, from $8 to $10 per acre more at the death of Irvine than it was in 1830.

WATTS, President, charged, *inter alia*, that clearing land is not *per se* waste, but is so or not, as it may have been necessary, for the proper enjoyment of the particular estate, without producing any permanent injury to the inheritance, &c. But, if, "apart from all considerations of rise in price, or other extrinsic circumstances, he left the estate from seven to ten dollars an acre better than he found it, it would be difficult to imagine any rule of right by which we could measure the amount of damage which the plaintiff has sustained."

As to the removal of the buildings, he charged:

But, if we are to depart from the sensible rule that damage cannot be recovered unless they have been sustained by the plaintiff, what is to be the measure of his right to recover? the value of the buildings removed? If this be so, then it must follow, that the greater the expenditure made by the tenant of the particular estate, the greater would be the amount of damages revoverable from him. Certainly this cannot be the proper standard. Then what is it? For unless he can refer the jury to some proper measure of damages, established by the evidence in the cause, it follows necessarily that none is recoverable. We put this branch of the case, therefore, upon the same ground that we did the other—that if there has been any injury done to the inheritance by the erection and removal of the buildings, the plaintiff would be entitled to recover damages commensurate with such injury. But if the inheritance was left by the tenant for life as valuable, independent of the consideration of all circumstances but his own acts and conduct respecting it, as when he entered upon it, and more so, then, we think, the plaintiff is not entitled to recover.

This opinion was excepted to by the plaintiff's counsel.

Errors were assigned to the charge.

The case was argued by *Graham & Gaullagher*, for M'Cullough, plaintiff in error.—It was not contended that the laws of England on the subject of waste, or to cutting timber, or converting wood

land into arable, were applicable to Penna.; but the inquiry was whether the act complained of was an injury to the inheritance: 4 *Watts* 463; 6 *W. & S.* 171. As to the removal of the buildings, 3 *East.* 28, Elwes *vs.* Maw.

*Hepburn & Biddle*, for the Executors.—The merits are with the defendants. The testator improved the property by his labor.— When the life estate dropped, the inheritance to the reversioner was intrinsically worth more than when Irvine came into possession of it. Plaintiff has not sustained actual damage; and in action upon the case, recovery is had, only upon the justice and conscience of the case: 2 *Barr* 204. In Penna. agriculture is a trade; and if the fixtures in question be regarded as trade fixtures, the tenant had the right to remove them. That the case of Elwes *vs.* Maw, has not beeen adopted in any State in this Union: 2 *Peters Rep.* 144; 20 *Johns.* 29; 3 *Esp. C.* 11; 4 *Pick.* 310, 11; 3 *Paige* 259; 2 *Kent* 345-7; *Gibbons on Fixtures*, 12; 2 *East* 88; 2 *Peters* 146.

The opinion of the court was delivered by

COULTER, J.—Waste is spoil or destruction committed in houses or other corporeal heriditaments to the injury of one who has the remainder or reversion in fee. And one of the illustrations put in the old books is pulling down a house, which as it is said is a crime of commission and voluntary waste. Suffering the house to fall down for want of repairs is waste also, but only permissive. In our own statute, act of 27th March, 1833, sec. 3, it is provided "that quarrying and mining and all such other acts as will do lasting injury to the premises, shall be considered as waste." We must of course except those cases of lease by contract, for the purpose of quarrying or mining, many of which no doubt exist in the State, as out of the purview and range of the statute, as between tenant for life and the remainder man. I think it may be safely asserted, that any act which does permanent injury to the freehold or inheritance is waste. The main question to be resolved in the case on hand, is therefore, whether the brick house, two stories high, and the bank barn 66 feet long by 33 feet wide and 7 feet of an overshot, with corn crib and wagon shed erected by the tenant for life during the life of his wife and child, who were the owners of the remainder in fee of two thirds, did become part of the freehold and inheritance or not. The tenant for life, Irvine, was the owner of the other third in fee; and after the death of his wife and child he threw down the house and barn, and hurled the materials away, because the remainder man would not give the price he asked for the whole inheritance. This suit is instituted by the remainder man against the executors of Irvine, who held the life estate in two thirds of the freehold. The defendants

allege that notwithstanding Irvine pulled down the house and barn and its adjuncts and sold off a large quantity of timber, leaving but a small portion of woodland, that yet he is not answerable in damages, because the land at the death of Irvine, in its denuded state, was worth as much and more than it was valued at, when the life estate first accrued, and he took possession. And the court below sustained this ground, summing up their instructions to the jury in these comprehensive words; "But if the inheritance was left as valuable by the tenant for life, independent of the consideration of his own acts and conduct respecting it, as when he entered upon it, and more so, then we think the plaintiff is not entitled to recover." I cannot assent to this view of the case. It is attempted to be sustained by those exceptions to the general rule of permanent improvements becoming part of the freehold, which in favor of trade permit fixtures or machinery to be severed from the inheritance by a tenant. Agriculture is denominated a trade, and a brick house and a barn are alleged to be the implements and instruments by which it is carried on, and which are essential to its comfortable prosecution. The hypothesis has a bold and dashing novelty about it, and is not without plausibility. Husbandry has been considered a more primitive and simple occupation than handy work or mechanism, and it is by some called a science. But call it a trade; still its success and its products depend upon the showers of heaven and the nutriment of the earth. A cider press is an instrument by which cider is made, and like a plough and a harrow or a threshing machine, is an implement of agriculture and belongs to the tenant. But a two story brick house and a large bank barn, are not instruments or implements of any trade. But they are great conveniences which enable men of all sorts to enjoy the fruits of their labor or trade. If you make these an exception the rule itself is obliterated, and nothing is essentially of the realty, except the earth itself and that which is in its bowels.

The exceptions have been carried very far by some decisions in the Eastern States, particularly in Whiting *vs.* Barstow, 4 *Pick.* 310; Holmes *vs.* Tremper, 20 *Johns.* 29, and also in Van Ness *vs.* Packard, 2 *Peters*, 38. It is however, in somewhat loose expressions of the court in those cases, and not from the cases themselves, that the principle asserted by the court below derives some countenance. The first, where the dicta is the most latitudinarian, was merely the removal of a padlock and some loose boards; about which there never could have been any reasonable doubt. The second was the removal of a cider press by the tenant; and there no reasonable doubt of its being an implement for the manufacture of cider would be entertained. The last case runs to a little more magnitude, for it was removing a sort of a house. But a house erected for the purpose of manufacturing a commodity;

VOL. I.—2C.

[M'Cullough *v.* Irvine's Executors.]

it was more properly, a shop for making oil; and the decision goes expressly on the ground of its not being a dwelling house. But none of these cases either expressly or by implication overrule or impeach the case of Elwes *vs.* Maw, 3 *East* 28, in which it was held that an agricultural tenant could not remove during the continuance of his lease, a beast, house, carpenter shop and fuel house, &c. erected for the use of the farm, even though he left the premises as he found them. In that case the whole law on that subject was ably reviewed; and although it is an English case, I believe it to be the law of Pennsylvania, and for the very same reason that the court below give for a contrary opinion.

In my judgment that is a rule which tends to promote the interests of agriculture, whilst its converse would tend to retard and impend its progress. We must have many tenancies for life in Pennsylvania, by will, by deed, and by descent; and if the tenant after having enjoyed the fruits of the land during perhaps a long life, may, just before his death, strip it of the fences he has built, and the house and barn he has erected, because the advance in the improvement and commerce of the country would leave the land of as much intrinsic value as when he took possession, and convert it into a solitary waste for the winds to moan over; the tenant of a new generation will have to take the land as it was a generation before, and commence improvements *de novo*. This, I apprehend, would be a slovenly mode of promoting the interests of agriculture.

There is a debt due to the land in return for its fruits and products, and a good tenant for life always pays it. He manures it, fences it, and builds a habitation on it, and they become part of the freehold, and thus the interest of agriculture is promoted. These exertions are the voluntary gift of the life tenant, to the inheritance. He dedicates them to the inheritance when he has enjoyed the fruits of his labor. A good farmer creates, but does not destroy; and I may add, that this rule, just in itself, has a tendency to liberalize the social affections as well as to promote agriculture.

It banishes that sordid and selfish spirit which would destroy what the individual can no longer enjoy.

All fixtures and erections which the law allows a tenant for years to remove, are put up for the avowed purpose of a temporary occupancy. He pays a suitable compensation under contract for liberty to erect them for the uses of his particular trade or calling. They are designed for his use and his alone. Not so with the tenant for life in the case on hand. He was himself owner of one-third of the inheritance, his wife and child were owners of the reversionary interest in the other two thirds. Who then can doubt his intention of making these buildings with a view of benefitting the inheritance, for himself, for his wife and

child; by that intent and act he dedicated them to the freehold, and so incorporated them with the inheritance as to foreclose his power of recal after the death of his wife and child, to the disherison of their heirs.

With regard to cutting and selling timber, the law has undoubtedly undergone some change from what it was at one time in England. It is not waste in Pennsylvania to turn arable land into meadow nor *vice versa;* nor is it waste to clear land by a tenant for life. But there is a due and reasonable medium to be observed, according to the custom of farmers. To cut down all the timber on a tract of land and sell it, would be waste, because it would be injurious and detrimental to the inheritance.

The question is not whether the land may be of equal value at the falling in of the life estate to what it was when it commenced. But it is whether the inheritance has been injured. Because a plantation, now although entirely stripped of its forest, might be of as much value as it was thirty years ago, when one half of it was covered with timber; and yet if one-third of the timber remained, it might and probably would be now worth one-third more. This would depend upon the custom of farmers, the situation of the country, and the value of timber; and would be estimated by the jury from the evidence in the cause under the instruction that the rule is whether the inheritance has been injured or not.

With regard to the house and barn, they having become part of the inheritance by the intent and act of the defendant's testator, the rule of damages is the same, to wit: how much was the inheritance injured by their destruction? In regard to both, however, it must be observed that Irvine was the owner of one-third of the inheritance.

To that extent the defendants are protected; I presume the claim is only for two-thirds; all that can be recovered is two-thirds of the amount of damages for waste committed by Irvine, in the destruction of the house and barn and an undue proportion of timber.

   Judgment reversed and *venire de novo* awarded.